**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Juan RAMIREZ–LOPEZ, Defendant–Appellant.**

No. 01–50164.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 14, 2002.

Filed Jan. 10, 2003.

zona, sitting by designation.

Mark S. Windsor, San Diego, CA, for the defendant-appellant.

John M. Parmley, Assistant United States Attorney, San Diego, CA, for the plaintiff-appellee.

Before KOZINSKI and GOULD, Circuit Judges, and CEBULL,* District Judge.

Opinion by Judge CEBULL; Dissent by Judge KOZINSKI

* The Honorable Richard F. Cebull, United States District Judge for the District of Mon-

## OPINION

CEBULL, District Judge.

Juan Ramirez–Lopez (Ramirez–Lopez) seeks reversal of his jury conviction for criminal violations 8 U.S.C. § 1324(a)(1)(A)(i), (a)(1)(A)(ii), (a)(1)(B)(iv), and (a)(2)(B)(ii) (alien smuggling, alien smuggling for profit, and transportation of aliens resulting in death). He was sentenced to a term of seventy-eight (78) months. On appeal, the Defendant raises a number of issues, specifically, whether (1) the Defendant's due process and compulsory process rights were violated when the Government removed witnesses from the United States before Defense Counsel could interview them because Ramirez–Lopez failed to demonstrate either bad faith by the Government or prejudice to his case; (2) inadmissible evidence and improper argument by the Government occurred at trial that would constitute reversible error; (3) cumulative errors occurred at trial as to justify reversible error; (4) whether 8 U.S.C. § 1324 is unconstitutional in light of the U.S. Supreme Court's ruling in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); and (5) whether evidence of *mens rea* as it relates to death is a required element in finding guilt under 8 U.S.C. § 1324(a)(1)(B)(iv).

## FACTS

On March 6, 2000, Defendant–Appellant Ramirez–Lopez was arrested with fourteen others who had crossed the border into the United States from Mexico through the mountains of eastern San Diego County. During that crossing, due to inclement weather, a member of the party

tana, sitting by designation.

died of hypothermia. Upon placement in custody, Appellant Ramirez–Lopez was taken to the hospital for frostbite and subsequently interviewed. During his interview by border patrol agents, he waived his *Miranda* rights as well as his *Lujan–Castro* right to retain otherwise deportable witnesses. During that same interview, he denied being the leader of the group.

When border patrol agents interviewed the other fourteen members of the group, two of the members inculpated Ramirez–Lopez as the guide or leader of the group while the remaining members exculpated him, denying that he was the guide. Rather, they stated that their guide had abandoned them or that they did not have a guide. Pursuant to the Defendant's *Lujan–Castro* waiver, the border patrol returned all but five of the witnesses. The Government did not ascertain the exact home addresses of the deported witnesses. Border Patrol officers retained two witnesses that inculpated Ramirez–Lopez and three that exculpated his involvement as a guide.

Prior to trial, Ramirez–Lopez made a number of motions *in limine*. Specifically, he moved for dismissal on various grounds including (1) the involuntary waiver of his *Miranda* and *Lujan–Castro* rights; (2) the unconstitutionality of the charges against him in light of *Apprendi v. New Jersey;* and (3) the unreasonable delay between custody and arraignment. The district court denied the Defendant's motions.

## ANALYSIS

### I. Were Ramirez–Lopez's Due Process and Compulsory Process Rights Violated When the Government Removed Witnesses from the United States Before Defense Counsel Could Interview Them?

■ Appellant Ramirez–Lopez contends that the district court erred when it failed to dismiss the indictment (1) because he had not voluntarily and intelligently waived his *Miranda* and *Lujan–Castro* rights; and (2) due to the delay in arraignment. Further, he contends that the government violated his rights under the Due Process Clause of the Fifth Amendment and Compulsory Due Process Clause of the Sixth Amendment when they deported nine witnesses that had exculpatory and material testimony regarding his role in the offense charged. The denial of a motion to dismiss based on a violation of constitutional rights is reviewed de novo. *United States v. Lam,* 251 F.3d 852, 855 (9th Cir.2001) (Sixth Amendment); *United States v. Muro–Inclan,* 249 F.3d 1180, 1182 (9th Cir.2001) (Due Process).

### A. Waiver of Miranda and Lujan–Castro Rights

■ In determining whether a voluntary and intelligent waiver of Ramirez–Lopez's *Miranda* and *Lujan–Castro* rights was had, the district court held an evidentiary hearing on the Defendant's motion to suppress the waivers and a motion to dismiss the indictment. At that hearing, Ramirez–Lopez argued that he did not waive his *Miranda* rights nor did he waive his *Lujan–Castro* right to retain otherwise deportable witnesses. Ramirez–Lopez acknowledges that he was advised of his *Miranda* and *Lujan–Castro* rights and did voluntarily sign both waivers, but he contends that they were not done knowingly or intelligently.

Specifically, he argues that at the hearing, he testified that he had little education; that he could not read or write; that he had just been hospitalized for frostbite on his feet; and that in another case involving a group of aliens seized that same day and in that same area, the Government had detained all eight witnesses, all of whom provided inculpatory informa-

**1150**

tion regarding a Defendant in a different case.[1]

Subsequent to the hearing, the district court denied Ramirez–Lopez's motion to suppress the *Miranda* and *Lujan–Castro* waiver. The district court found that the Government had a fluent Spanish-speaking agent interviewing Ramirez–Lopez, that Ramirez–Lopez was responsive and understood the questions asked of him and that Ramirez–Lopez made no mention of any pain during the interview.

■ Motions to suppress are reviewed de novo. *United States v. Percy*, 250 F.3d 720, 725 (9th Cir.2001). On the aforementioned facts, the district court held that Ramirez–Lopez's waivers were made knowingly, intelligently and voluntarily. A review of the record reveals that the district court's findings supporting Ramirez–Lopez's *Miranda* waiver were more detailed than those upholding the *Lujan–Castro* waiver. Given that the waivers were made within the same interview and time frame, we impute the district court's *Miranda* findings to the Ramirez–Lopez's *Lujan–Castro* waiver and hold the district court's failure to make a more detailed finding, as to Ramirez–Lopez's *Lujan–Castro* waiver, harmless.

■■ In addition, Ramirez–Lopez contends that when he waived his *Lujan–Castro* right, he was not assisted by counsel and was not informed as to how the witnesses might be used nor to what facts the witnesses might testify. Whether a waiver was knowingly and intelligently made is reviewed for clear error. *United States v. Amano*, 229 F.3d 801, 803 (9th Cir.2000). A reading of *United States v. Lujan–Castro* reveals no stated requirements that assistance of counsel is necessary before a waiver of a *Lujan–Castro* right can be had, so long as the waiver is made knowingly, intelligently and volun-

tarily. 602 F.2d 877 (9th Cir.1979). Moreover, a defendant need not understand all the possible consequences that would flow from waiving a right in order to execute a valid waiver. *Derrick v. Peterson*, 924 F.2d 813, 824 (9th Cir.1990). Upon review, we find that the district court did not commit clear error by finding that Ramirez–Lopez knowingly and intelligently waived his right to detain deportable alien witnesses.

### B. *Delay in Arraignment*

■ Ramirez–Lopez alleges that the district court erred when it failed to dismiss or, in the alternative, suppress incriminating statements due to delay in arraignment. We review the district court's ruling for clear error. *United States v. Padilla–Mendoza*, 157 F.3d 730 (9th Cir. 1998). Ramirez–Lopez was taken into custody at approximately 10:30 a.m. on March 6, 2000. That same day, the Mexican consulate came and spoke to him. Also on that day, agents spent time trying to identify the dead body that was found. At approximately 7:40 p.m, the agents gave *Miranda* warnings to Ramirez–Lopez and began interviewing him. Prior to his arraignment, the agents did not interview him again. Although Ramirez–Lopez did not confess at the interview, he did make incriminating statements. Agents spent the next day preparing the complaint and interviewing multiple material witnesses. He was not arraigned until 10:07 a.m. on March 8, 2000. On the morning of March 8, 2000, the magistrate judge reviewed the Government's complaint and found probable cause for its support.

■ Ramirez–Lopez contends the resulting delay of almost 48 hours from custody to arraignment was clearly for the purposes of interrogation and justified a

---

**1.** *United States v. Matus–Leva*, 311 F.3d 1214.

dismissal of the indictment for unreasonable and unnecessary delay or, at the very least, suppression of any incriminating statements he may have made. As Ramirez–Lopez received his probable cause determination within 48 hours, he carries the burden of proving that the border patrol agents unnecessarily delayed the hearing in order to interrogate him. *Riverside v. McLaughlin*, 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991) (*citing Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975)).

Federal Rule of Criminal Procedure 5(a) requires "[a]n officer making an arrest under a warrant ... [to] take the arrested person without unnecessary delay before the nearest available magistrate judge...." *United States v. Van Poyck*, 77 F.3d 285, 288 (9th Cir.1996). This requirement is balanced against the presumption that a complaint reviewed by a magistrate judge within 48 hours of arrest is presumed reasonable. *Riverside*, 500 U.S. at 56, 111 S.Ct. 1661. The Defendant bears "the burden of showing that any delay was unreasonable." *Id.*

The district court found that the delay in arraignment was reasonable due to the number of witnesses to be interviewed, Ramirez–Lopez's need for medical treatment and the circumstances behind the death of one of the border crossing members. In reaching its conclusion, the district court found it significant that, after the interview on the evening of March 6, 2000, agents conducted no further interviews with him prior to arraignment. In the circumstances of this case, we find the delay was not unreasonable. *County of Riverside*, 500 U.S. at 56–57, 111 S.Ct. 1661; *Van Poyck*, 77 F.3d at 288–89. Accordingly, we find that the district court did not err in denying the motion to suppress the statements on the basis of pre-arraignment delay.

C. *The Deportation of Witnesses was not in Violation of Ramirez–Lopez's Right to Compulsory Due Process*

Ramirez–Lopez contends that the district court erred when it denied his motion to dismiss in light of the Government having deported material witnesses in violation of his right to Compulsory Due Process and Fifth Amendment right to Due Process. *United States v. Valenzuela–Bernal.* 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982). He also contends that the district court erred when it denied his motion to have the statements of the material witnesses read to the jury. Whether an indictment should be dismissed for failure of the Government to retain alien witnesses is reviewed de novo. *United States v. Armenta*, 69 F.3d 304, 306 (9th Cir.1995). Ramirez–Lopez contends that there was a reasonable likelihood that the testimony of the removed witnesses could have affected the trier of fact and that the Government's act of deporting his potential witnesses was a violation of his due process rights. *Valenzuela–Bernal*, 458 U.S. at 874, 102 S.Ct. 3440.

Both parties agree that the mere deportation of a witness by the Government does not constitute a violation of the Compulsory Due Process Clause of the Sixth Amendment or of the Due Process Clause of the Fifth Amendment. *Id.* Rather the burden falls on the defendant to make a "plausible showing" that the Government's deportation of a witness whom the defendant wishes to question deprived him of testimony that would have been material and favorable to his defense, "in ways not merely cumulative to the testimony of available witnesses." *Id.* at 873, 102 S.Ct. 3440.

In order to prevail on a *Valenzuela–Bernal* claim, Ramirez–Lopez must satisfy a two-prong test of (1) an initial show-

ing that the Government acted in bad faith; and (2) that this conduct resulted in prejudice to Ramirez–Lopez's case. *United States v. Dring*, 930 F.2d 687, 693 (9th Cir.1991). Ramirez–Lopez contends that both prongs are satisfied in light of the Government's deportation of nine material witnesses who would have allegedly testified in his favor.

Reviewing the first prong, Ramirez–Lopez contends that a showing of bad faith is not actually required under *Valenzuela–Bernal*. Rather, Ramirez–Lopez argues that this Court misunderstood the scope of the U.S. Supreme Court's ruling in *Valenzuela–Bernal*. Ramirez–Lopez contends that in *Dring*, this Court added a requirement that the Defendant had the burden to make a bad faith showing by the Government where none existed. Ramirez–Lopez argues that this requirement exceeded the scope of the U.S. Supreme Court's holding in *Valenzuela–Bernal*. Even if true, Ramirez–Lopez's argument is irrelevant because *Dring* is binding on this panel absent an intervening Supreme Court or Ninth Circuit en banc decision. *United States v. Gay*, 967 F.2d 322, 327 (9th Cir.1992).

■■■ Further, we need not define the precise contours of "bad faith" in this context because Ramirez–Lopez has failed to establish the requisite prejudice prong as required by *Dring*. To establish prejudice, Ramirez–Lopez must at least make "a plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses." *Dring*, 930 F.2d at 693–94 (*quoting Valenzuela–Bernal*, 458 U.S. at 873, 102 S.Ct. 3440 (1982)). Ramirez–Lopez was aided by the testimony of the three alien witnesses who were not deported in the face of his *Lujan–Castro* waiver; they testified at trial that Ramirez–Lopez was not the guide or

leader. The testimony of more people that he was not the guide or leader would have been cumulative. *U.S. v. Tafollo–Cardenas*, 897 F.2d 976 (9th Cir.1990). Since the deported witnesses would have most likely given the same testimony, the district court's refusal to admit their statements was consistent with *Dring* and *Valenzuela–Bernal's* holding, as the statements would have been cumulative. Ramirez–Lopez has failed to show how the deported witnesses' testimonies were more than "merely cumulative." Thus, absent a more substantial showing of prejudice than Ramirez–Lopez has made in this case, he is not entitled to relief under *Dring*.

■■■ Additionally, Ramirez–Lopez contends that the district court erred when it denied his motion to admit the statements of his exculpatory witnesses in light of their deportation. The record reflects that after their interviews, the border patrol officers made notes which contained statements taken from the witnesses. At the hearing on this issue, Ramirez–Lopez sought admission of these reports containing the deported witnesses' statements under the 'catch-all' exception of Federal Rule of Evidence 807. The district court found the deported witnesses unavailable under the hearsay rule, but denied Ramirez–Lopez's motion to admit the statements of the nine deported witnesses on the grounds that the statements would be cumulative. A district court's order precluding certain testimony is an evidentiary ruling subject to review for an abuse of discretion. *United States v. Ravel*, 930 F.2d 721, 726 (9th Cir.1991).

Presently, Ramirez–Lopez contends that the district court's ruling was erroneous because it is contrary to the Federal Rules of Evidence as well as the Due Process Clause of the Fifth Amendment and the Compulsory Process Clause of the Sixth

Amendment. The witness or witnesses' statements found in the border patrol notes, if admitted into evidence, would have been a hearsay report containing the deported witnesses' hearsay statements. *See* Fed.R.Evid. 801(c) (" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). These reports, if admitted, contain hearsay-within-in-hearsay. Federal Rule of Evidence 805 states, "[H]earsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule...." At a hearing on this issue, Ramirez–Lopez argued that these reports met the residual exception of the hearsay rule under Federal Rule of Evidence 807 and should be admitted.

 Hearsay evidence sought to be admitted under Rule 807 must have circumstantial guarantees of trustworthiness equivalent to the listed exceptions to the hearsay rule. *United States v. Sanchez–Lima*, 161 F.3d 545, 547 (1998) (*citing United States v. Fowlie*, 24 F.3d 1059, 1069 (9th Cir.1994)). Furthermore, the statements must (1) be evidence of a material fact; (2) be more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (3) serve the general purposes of the Rules of Evidence and the interests of justice by its admission into evidence. *Id.;* Fed.R.Evid. 807. At the hearing, Ramirez–Lopez made strong arguments for the three prongs of Rule 807, but presented no argument in support of the "circumstantial guarantees of trustworthiness" of the witnesses' statements, as stated in *Fowlie. Id.* In *Sanchez–Lima*, the Court admitted videotaped statements of witnesses, in part, after it found that the statements possessed guarantees of trustworthiness because the declarants were under oath

and subject to the penalty of perjury. *Id.* In the present case, no evidence has been presented to the Court that these statements were made under oath and Ramirez–Lopez has not directed the court to any other evidence that establishes that the statements possess guarantees of trustworthiness. Aside from the district court's ruling of cumulative, the deported witness statements contained in the border patrol's interview notes do not fall within the "catch-all" hearsay exception of Fed. R.Evid. 807. On the aforementioned grounds, we find that the district court did not abuse its discretion in denying the motion to dismiss.

**II. Did the District Court Err in Admitting Ramirez–Lopez's Statements at Trial; at Refusing to Grant a New Trial on the Testimony of a Government Witness; and at Allowing the Jury to Consider Allegedly Improper Argument and Commentary by Government During Rebuttal?**

**A. *404(b) Evidence***

 Ramirez–Lopez contends that the district court erred by not precluding testimony from a Government witness regarding a threat made against him by Ramirez–Lopez. A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. *United States v. Alatorre*, 222 F.3d 1098, 1100 (9th Cir. 2000) The trial court's decision to admit evidence of prior crimes or bad acts pursuant to the Federal Rule of Evidence 404(b) is reviewed for abuse of discretion. *United States v. Chea*, 231 F.3d 531, 534 (2000). Such decisions will be reversed for an abuse of discretion only if such nonconstitutional error, more likely than not, affected the verdict. *United States v. Ramirez*, 176 F.3d 1179, 1182 (9th Cir.1999). However, if a party fails to object to admission of the evidence, admission of that evidence

is reviewed only for plain error. *Johnson v. United States,* 500 U.S. 461, 466 (1997).

During the testimony of the Government's material witness, Jose Alvardo, the Government elicited testimony from him stating that just prior to testifying, Ramirez–Lopez threatened him by moving his finger in a back and forth direction indicating to Alvardo not to say anything. Ramirez–Lopez's attorney made no objection at trial regarding this testimony, but now contends that the threat was "other acts" or "wrongs" that are not "intrinsic" to charges in the indictment. Ramirez–Lopez alleges that these statements constitute prior "bad acts" under Federal Rule of Evidence 404(b) and therefore, the Government should have provided him reasonable notice of this testimony. In the alternative, Ramirez–Lopez argues that even with notice the allegation was baseless and, even if true, could only be admitted for the limited purpose of showing propensity for criminal activity. In response, the Government contends that the threats occurred only moments before the witness was to testify.

When Alvardo was led into the courtroom during a break, he sat in the back and spoke with the interpreter. On the stand, Alvardo states that while he was sitting there, Ramirez–Lopez turned around and wagged his index finger at him in an unspoken attempt to silence his testimony. The Government contends that any defect in the record is directly attributable to Ramirez–Lopez's failure to object.

■■■ The Government further contends that the threat was not 404(b) evidence, since the threat was evidence concerning the crime charged and therefore "inextricably intertwined." *United States v. Warren,* 25 F.3d 890, 895 (9th Cir.1994). Here, Ramirez–Lopez was charged with transportation for profit of illegal aliens into the United States resulting in death. We find that the Government's contention is with-

out merit. A threat at trial cannot be viewed as "inextricably intertwined" with a charge of transportation for profit of illegal aliens and therefore cannot be construed as falling outside the purview of 404(b).

■■■ Evidence demonstrating Ramirez–Lopez's consciousness of guilt is admissible under Fed.R.Evid. 404(b) if the court determines that the evidence is more probative than prejudicial under a Fed.R.Evid. 403 balancing test. Evidence of threats by Ramirez–Lopez against a potential witness, if this balancing test is satisfied, can be used to show guilty knowledge. *Ortiz–Sandoval v. Gomez,* 81 F.3d 891, 897 (9th Cir.1996). As such, the question then turns on whether the Government should have given notice to Ramirez–Lopez of its intent to elicit testimony regarding the threat since he had made a pretrial request for all 404(b) evidence.

There is no doubt that once the Government discovered this information, they could have asked for a sidebar and informed the district court of the threat and allowed the defense attorney time to question the witness as Rule 404(b) would dictate under the notice requirement. The failure by the Government to do so was in error. However, since the Defense attorney failed to make a Rule 404(b) objection for lack of notice and request the district court to exclude the evidence or give the jury a limiting instruction, this Court reviews for plain error. *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

In *Olano,* the Supreme Court explained that to correct for plain error, there must be an actual error and not merely a waiver of rights. *Id.* Moreover, the error must be "clear" or "obvious" under current law and the error must "affect substantial rights" in that it affected the outcome of the proceedings. *Id.* This Court must now balance between the Government's failure to

give notice and Ramirez–Lopez's failure to object and determine whether the district court's decision in admitting the evidence was in plain error.

This Court has held that a denial of a motion for a mistrial error may be deemed harmless and not an abuse of discretion, when based on allegedly improper evidence of a defendant's past actions under 404(b), if the defendant failed to object contemporaneously or to move to strike the testimony. *United States v. Guerrero,* 756 F.2d 1342, 1347–48 (9th Cir.1984). Accordingly, since Ramirez–Lopez failed to object contemporaneously to Government Witness Alvardo's testimony regarding the threat, we find the district court's decision to deny the motion for a new trial was not in error.

B. *Did the District Court Err in Refusing to Grant a Mistrial in Light of the Government Witness Revealing to the Jury That a Member of the Group Died?*

■ Prior to the trial, the district court had ruled that the fact a member of the group had died during the crossing was extremely prejudicial and, subsequently, precluded any mention of it at trial. Although the witnesses had been told to make no mention of the deceased member, in the course of his examination at trial, in response to an unrelated question, Government witness Alvardo made a nondescript statement that a member of the group had died. At sidebar, Ramirez–Lopez subsequently moved for a mistrial. The district court found Alvardo's statement to be nondescript and denied his motion. Ramirez–Lopez neither moved for the testimony to be stricken nor did he ask for a cautionary instruction. In his brief, he cites no case law in support of his position that the extreme prejudicial nature of the evidence

required a mistrial at the time and requires reversal now.

■ This Court reviews the district court's rulings on objections for abuse of discretion. *United States v. Ortland,* 109 F.3d 539, 543 (9th Cir.1997). Given that the line of questioning by the Government was not intended to place emphasis on the deceased member and the statement was made inadvertently, we find that the district court did not abuse its discretion in denying the motion for a mistrial.

C. *Prosecutorial Misconduct by False Assertions During Closing Arguments*

■ On appeal, Ramirez–Lopez contends that the district court erred when it allowed the Government to commit prosecutorial misconduct during closing argument. A district court's rulings on objections to alleged prosecutorial misconduct are reviewed for an abuse of discretion. *United States v. Sarkisian,* 197 F.3d 966, 988 (9th Cir.1999). Specifically, Ramirez–Lopez alleges that during closing argument, the Government made statements that (1) defense witnesses had been threatened; (2) there was a criminal organization involved in the case, and that Ramirez–Lopez was part of that organization; and (3) the Government incorrectly asserted that defense counsel had failed to ask a crucial question when, in fact, he had. Ramirez–Lopez contends that these statements, in total, amounted to prosecutorial misconduct. The Government concedes that it misstated the fact that defense counsel had not asked a crucial question when, in fact, he had, therefore committing prosecutorial misconduct. But the government contends this error to be harmless.[2]

■ Regarding the first contention that the defense "witnesses" had been

---

**2.** The Argument was: Why didn't they just ask (Sada) that question? "Did the group, to

you, appear lost and disoriented." ER 255–256.

threatened, Ramirez–Lopez objected on the grounds that there was no evidence of this during the trial. In response, the Government makes a conclusory statement saying that since Ramirez–Lopez did threaten *a* witness, it was appropriate for the Government to make the argument that "witnesses" had been threatened. Granted there was evidence that Ramirez–Lopez did threaten one of the Government's witnesses, but to expand that evidence to argue that Ramirez–Lopez threatened more than one witness is prosecutorial misconduct.

■ As to the second contention that Ramirez–Lopez was a part of a larger organization, the Government states that evidence was presented at trial revealing that this smuggling service was being provided at a cost, that the group was going to Los Angeles and points north and that they did not make any arrangements with Ramirez–Lopez nor were they going to pay him. From this evidence, the Government inferred that Ramirez–Lopez was part of a larger organization. As the Government's statements regarding a larger organization were based upon reasonable inferences from the evidence, we find that the district court did not abuse its discretion in overruling the Ramirez–Lopez's objection as to that issue. *United States v. Cabrera*, 201 F.3d 1243, 1250 (9th Cir. 2000); *United States v. Nash*, 115 F.3d 1431, 1439 (9th Cir.1997).

■ Although some of the statements made during the Government's closing arguments can be construed as prosecutorial misconduct, ultimately, this Court must decide whether Ramirez–Lopez's due process rights were so violated by prosecutorial misconduct it would render a trial "fundamentally unfair." *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). The appellate court must review the record "to determine whether the prosecutor's remarks 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Hall v. Whitley*, 935 F.2d 164, 165 (9th Cir.1991) (*quoting Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). In reviewing the record in the light of these standards, we cannot conclude that the Government's prosecutorial misconduct "so infected the trial with unfairness" that Ramirez–Lopez suffered a violation of his due process rights. At best, the prosecutorial conduct was harmless error. The jury was present throughout the trial and would have been capable, amongst themselves, to ascertain what was said at trial and weigh the Government's closing arguments accordingly. Therefore, we find that the district court did not abuse it discretion regarding prosecutorial misconduct rulings during closing arguments.

**III. Did the District Court Err by Not Reversing Ramirez–Lopez's Conviction in Light of the Cumulative Error That Occurred at Trial?**

■ Ramirez–Lopez argues that even if no single error warrants a reversal, the cumulative effect of these errors at trial so prejudiced him that the only cure, when viewed overall, is reversal. In some cases, although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a Defendant. *U.S. v. Frederick*, 78 F.3d 137 (9th Cir.1996) (*citing United States v. Green*, 648 F.2d 587 (9th Cir.1981)). Where there are a number of errors at trial, "a balkanized, issue-by-issue harmless error review" is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial against the defendant. *United States v. Wallace*, 848 F.2d 1464, 1476 (9th Cir. 1988). Finally, "whether the alleged errors prejudiced the [defendant's right] to a

fair trial depends in turn upon the strength of the Government's [case] against [him; ] the stronger the prosecution's case, the less likely that a defendant would be prejudiced by error or misconduct." *United States v. Nadler,* 698 F.2d 995 (9th Cir.1983).

In the present case, alleged errors at trial that may be considered toward claims of cumulative error are (1) the prosecutorial misconduct during closing argument; (2) the testimony of the government witness being threatened; and (3) the testimony that a member of the group had died during the border crossing. A review of the record reveals that the Government had a relatively strong case against Ramirez–Lopez. They had testimony of agents who interacted and observed Ramirez–Lopez; they had testimony of witness Sheila Sada, who stated that, from her observation, Ramirez–Lopez conducted himself like he was the leader; and they had members of the border crossing party testifying that Ramirez–Lopez guided them through the mountains. Balancing any errors that were committed at trial against the strength of the Government's case, we find that any cumulative error was harmless error at best and does not warrant a reversal of his conviction.

## IV. Ramirez–Lopez's Motion to Dismiss the Indictment Based on the Unconstitutionality of § 1324 Under Apprendi.

Ramirez–Lopez moved to dismiss the indictment based on the unconstitutionality of § 1324 under *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). He alleges that the statute sets out the substantive crime separately from the possible penalties and permits increased penalties in certain circumstances. We review the district court's denial of the claim de novo. *United States v. Jones,* 231 F.3d 508, 513 (9th Cir.2000).

This argument is wholly without merit. This case does not come within the literal terms of *Apprendi,* nor its reasoning, because this case does not involve sentencing factors to be decided by a judge that increase the penalty beyond the statutory maximum. *Id.,* 530 U.S. at 490, 120 S.Ct. 2348.

## V. Is § 1324(a)(1)(B)(iv) Unconstitutionally Vague?

■ Ramirez–Lopez contends that 8 U.S.C. § 1324(a)(2) is unconstitutionally vague because there is no mens rea attached to the "resulting in ... death" factor. The district court held that the relevant subsection was not unconstitutionally vague. We review de novo. *Jones,* 231 F.3d at 513. Section 1324 proscribes alien smuggling and provides that, when the smuggling "result[s] in the death of any person," increased penalties will apply.[3] 8 U.S.C. § 1324(a)(1)(B)(iv). The Supreme Court has held "that, as a matter of due process, a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute, or is so indefinite that it

---

**3.** Section 1324(a)(1) provides, in relevant part:

(A) Any person who—

(i) knowing that a person is an alien, brings to or attempts to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry or place other than as designated by the Commissioner ...;....

(B) A person who violates subparagraph (A) shall, for each alien in respect to whom such a violation occurs—

....

(iv) in the case of a violation of subparagraph (A)(i), (ii), (iii), (iv), or (v) resulting in the death of any person, be punished by death or imprisoned for any term of years or for life, fined under Title 18, or both.

8 U.S.C. § 1324(a)(1).

encourages arbitrary and erratic arrests and convictions, is void for vagueness." *Colautti v. Franklin,* 439 U.S. 379, 390, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979) (internal quotation marks and citations omitted). Ramirez–Lopez argues that, because the "resulting in ... death" portion of the statute has no explicit mens rea requirement, it is void for vagueness. According to Ramirez–Lopez, a person charged with violation of that subsection could be subject to increased penalties even if the resulting death had nothing to do with the smuggling. Ramirez–Lopez's argument lacks merit.

Although we have held that "criminal offenses requiring no *mens rea* have a generally disfavored status," *United States v. Nguyen,* 73 F.3d 887, 890 (9th Cir.1995) (citations and internal quotation marks omitted), we have found that section 1324 *does* have a mens rea requirement, namely that the alleged smuggler intended to violate the immigration laws. *Id.* at 894.

In *Nguyen,* this Court has stated that, We start from the basic premise that the definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute. Thus, in determining what mental state is required to prove a violation of [subsection (a)(1)(B)(iv)], the focus of our inquiry is the intent of Congress. *Id.* at 890 (internal quotation marks and citations omitted).

Moreover, "in determining the intent of Congress, we look first to the language of the statute." *Id.* Here, the language of the subsection at issue indicates that it does not have a mens rea requirement, whereas accompanying subsections do have mens rea requirements. *Compare* 8 U.S.C. § 1324(a)(1)(B)(iv) *with* 8 U.S.C. § 1324(a)(1)(B)(i). In such circumstances, it is proper to conclude that subsection

(a)(1)(B)(iv) does not have a separate mens rea requirement. *United States v. Rodriguez–Cruz,* 255 F.3d 1054, 1059 (9th Cir. 2001). Therefore, the only mental state required under subsection (a)(1)(B)(iv) is an intent to violate the immigration laws and knowledge that the individuals being smuggled are illegal aliens. *See Nguyen,* 73 F.3d at 894. *See also United States v. Matus–Leva,* 311 F.3d 1214 (9th Cir.2002) (holding for these reasons that the lack of a separate *mens rea* requirement in subsection (a)(1)(B)(iv) does not render it void for vagueness).

Contrary to Ramirez–Lopez's argument, subsection (a)(1)(B)(iv)'s lack of a separate mens rea requirement does not render that portion of the statute void for vagueness. First, it is clear from the statute's use of the word "resulting" that a defendant would not be subject to an increased penalty in a case where a death occurred in the course of smuggling but was totally unrelated to the smuggling. The term "resulting" unequivocally incorporates a causation requirement and thus puts persons of ordinary intelligence on notice that increased penalties may apply if they allow those they are smuggling to be exposed to life-threatening conditions during the smuggling process. Second, there is no danger that this subsection will chill constitutionally-protected conduct, *cf. Franklin,* 439 U.S. at 396, 99 S.Ct. 675, or that it will be used to subject persons engaging in wholly innocent conduct to criminal liability, *cf. Nguyen,* 73 F.3d at 893. Subsection (a)(1)(B)(iv) only provides increased penalties to those who have criminally smuggled aliens intending to violate the immigration laws. It thus reaches no constitutionally-protected or innocent conduct. We reject Ramirez–Lopez's vagueness challenge and affirm the district court in all respects.

## VI. Did the District Court Err in Applying an Eight–Level Upward Adjustment under the Sentencing Guidelines?

 Under section 2L1.1(b)(6)(4), a court may apply an eight-level upward adjustment to the sentence if any person died in the course of the offense. U.S.S.G. § 2L1.1(b)(6)(4). This Court has suggested that a mens rea of recklessness is required to impose an enhancement under section 2L1.1(b)(6)(4). *Rodriguez–Cruz*, 255 F.3d at 1059. At sentencing, the district court found that Ramirez–Lopez had acted recklessly. Moreover, the circumstances of the smuggling here appear to be similar to those in *Rodriguez–Cruz*, although there is less factual detail here. 255 F.3d at 1057–58. The present circumstances are also similar to the case of *United States v. Herrera–Rojas*, wherein the district court also granted, and this Court affirmed, an upward adjustment under U.S.S.G. § 2L1.12(b)(5) for intentionally or recklessly creating substantial risk of serious bodily injury or death. 243 F.3d 1139 (9th Cir.2001). Therefore, we find that the district court properly relied on section 2L1.1(b)(6)(4) of the federal sentencing guidelines in imposing an eight-level upward adjustment because a person died in the course of the offense.

## VII. Did the District Court err by adjusting Ramirez–Lopez's Offense Level Upwards Two Levels Based on Obstruction of Justice?

Ramirez–Lopez contends that the two-level enhancement for obstruction of justice based on testimony at trial that Ramirez–Lopez threatened a witness prior to trial was no more than mere accusation and should not be relied upon for an upward departure. Ramirez–Lopez further states that the Government's witness Alvarado was shown to be untrustworthy at trial when he allegedly lied on the stand in response to defense counsel's questions.

 The district court's upward adjustment for obstruction of justice under § 3C1.1 is reviewable for clear error. *United States v. Christman*, 894 F.2d 339, 342 (9th Cir.1990). The district court's factual findings in the sentencing phase are reviewed for clear error, but must be supported by a preponderance of the evidence. *United States v. Fox*, 189 F.3d 1115, 1118 (9th Cir.1999). U.S.S.G. § 3C1.1 allows for a two-level enhancement of Ramirez–Lopez's base offense level, if the Court finds that the Ramirez–Lopez "willfully obstructed or impeded or attempted to impede the administration of justice during the investigation, prosecution or sentencing of the instant offense." U.S.S.G. § 3C1.1, comment note 4(a) specifically includes "threatening."

The district court made a finding that Ramirez–Lopez did threaten the witness by wagging his finger and that it was reasonably inferable that the conduct was intended to influence the testimony. We find that the district court's decision to give Ramirez–Lopez a two-level enhancement was not clear error, given the testimony presented at trial.

AFFIRMED.

KOZINSKI, Circuit Judge, dissenting:

One can only imagine the conversation between Ramirez–Lopez and his lawyer after this opinion is filed:

Lawyer: Juan, I have good news and bad news.

Ramirez–Lopez: OK, I'm ready. Give me the bad news first.

Lawyer: The bad news is that the Ninth Circuit affirmed your conviction and you're going to spend many years in federal prison.

Ramirez–Lopez: Oh, man, that's terrible. I'm so disappointed. But you said

there's good news too, right?

Lawyer: Yes, excellent news! I'm very excited.

Ramirez–Lopez: OK, I'm ready for some good news, let me have it.

Lawyer: Well, here it goes: You'll be happy to know that you had a perfect trial. They got you fair and square!

Ramirez–Lopez: How can that be? Didn't they keep me in jail for two days without letting me see a judge or a lawyer? Weren't they supposed to take me before a judge right away?

Lawyer: Yes, they sure were. But it's OK because you didn't show that it harmed you. We have a saying here in America: No harm, no foul.

Ramirez–Lopez: What do you mean no harm? There were twelve guys in my party who said I wasn't the guide, and they sent nine of them back to Mexico.

Lawyer: Yeah, but so what? Seeing the judge sooner wouldn't have helped you.

Ramirez–Lopez: The judge could have given me a lawyer and my lawyer could have talked to those guys before the Migra sent them back.

Lawyer: What difference would that have made?

Ramirez–Lopez: My lawyer could have taken notes, figured out which guys to keep here and which ones to send back.

Lawyer: Hey, not to worry, dude. The government did it all for you. They talked to everyone, they took notes and they kept the witnesses that would best help your case. Making sure you had a fair trial was their number one priority.

Ramirez–Lopez: No kidding, man. They did all that for me?

Lawyer: They sure did. Is this a great country or what?

Ramirez–Lopez: OK, I see it now, but there's one thing that still confuses me.

Lawyer: What's that, Juan?

Ramirez–Lopez: You see, the government took all those great notes to help me, just so we'd know what all those guys said.

Lawyer: Right, I saw them, and they were very good notes. Clear, specific, detailed. Good grammar and syntax. All told, I'd say those were some great notes.

Ramirez–Lopez: And twelve of those guys all said I wasn't the guide.

Lawyer: Absolutely! Our government never hides the ball. The government of Iraq or Afghanistan or one of those places might do this, but not ours. If twelve guys said you weren't the guide, everybody knows about it.

Ramirez–Lopez: Except the jury. I was there at the trial, and I remember the

jury never saw the notes. And the officers who testified never told the jury that twelve of the fourteen guys that were with me said I wasn't the guide.

Lawyer: Right.

Ramirez–Lopez: Isn't the jury supposed to have all the facts?

Lawyer: Not all the facts. Some facts are cumulative, others are hearsay. Some facts are both cumulative and hearsay.

Ramirez–Lopez: Can you say that in plain English?

Lawyer: No.

Ramirez–Lopez: The jury was supposed to decide whether I was the guide or not, right? Don't you think they might have had a reasonable doubt if they'd heard that twelve of the fourteen guys in my party said it wasn't me?

Lawyer: He-he-he! You'd think that only if you didn't go to law school. Lawyers and judges know better. It makes no difference at all to the jury whether one witness says it or a dozen witnesses say it. In fact, if you put on too many witnesses, they might get mad at you and send you to prison just for wasting their time. So the government did you a big favor by removing those nine witnesses before they could screw up your case.

Ramirez–Lopez: I see what you mean. But how about the notes? Surely the jury would have got-ten a different picture if they had just seen the notes of nine guys saying I wasn't the guide. That wouldn't have taken too long.

Lawyer: Wrong again, Juan! Those notes were hearsay and in this country we don't admit hearsay.

Ramirez–Lopez: How come?

Lawyer: The guys writing down what the witnesses said could have made a mistake.

Ramirez–Lopez: You mean, like maybe one of those twelve guys said, "Juan *was* the guide," and the guy from Immigration made a mistake and wrote down, "Juan *was not* the guide"?

Lawyer: Exactly.

Ramirez–Lopez: You're right again, it probably happened just that way. I bet those guys from Immigration wrote down, "Juan wasn't the guide," even when the witnesses said loud and clear I was the guide—just to be extra fair to me.

Lawyer: Absolutely, that's the kind of guys they are.

Ramirez–Lopez: You're very lucky to be working with guys like that.

Lawyer: Amen to that. I thank my lucky stars every Sunday in church.

Ramirez–Lopez: I feel a lot better now that you've explained it to me. This is really

> a pretty good system you have here. What do you call it?
>
> Lawyer: Due process. We're very proud of it.

\* \* \*

The question at the heart of this case is both simple and important: May the United States get rid of witnesses it knows would provide evidence helpful to the defendant in a criminal case by putting those witnesses beyond the power of the court and beyond the reach of defense counsel? In all prior cases where witnesses were removed with a prosecution pending, no one knew what those witnesses might say; they could have been as helpful to the prosecution as the defense. Here, we have contemporaneous interview notes showing that twelve of the fourteen witnesses arrested with the defendant made statements unequivocally exculpating him as to the only issue of fact in the case—whether he was the expedition's guide rather than one of the guided. *See* p. 1171 n. 14 *infra.* Yet nine of those exculpating witnesses were removed from the United States before defense counsel was appointed and before the district court had an opportunity to consider the matter. The government did not even trouble to obtain contact information for those witnesses, frustrating all defense efforts to find them.

This is bad enough, but it gets much worse. At trial, the fact that twelve of the fourteen individuals who were traveling with defendant exonerated him was carefully hidden from the jury. No witness was allowed to testify to this fact, and the interview notes were suppressed. In fact, evidence was introduced that misled the jury about what the missing witnesses would have said: On cross-examination, one of the federal agents confidently reported that some of those deported had inculpated defendant, which we know is not true. Defense counsel called this dis-

crepancy to the attention of the district court and sought to introduce just enough evidence to impeach the agent's statement, but the court would have none of it—the agent's statement remained uncorrected and unrebutted.

Imagine if the shoe were on the other foot: A corporate defendant suspected of criminal conduct interviews some of its employees, and takes careful notes showing that the employees were aware of criminal activity. Before federal investigators can talk to the witnesses, the corporation whisks most of them to a foreign land where they are beyond the power of the United States. At trial, the corporation opposes the introduction of the inculpatory interview notes, arguing that they are hearsay and cumulative. And, when a corporate officer testifies, he suggests that some of the removed witnesses would have provided exculpatory evidence.

Is there any doubt what would happen in such a case? Any corporation that tried to pull a stunt like this would quickly find itself indicted for obstruction of justice, and the inculpatory notes would be ordered produced and introduced at trial. I can imagine no other result.

Should the outcome be different because the entity that put the witnesses beyond the power of the court is the United States? I think not. Indeed, the United States is subject to far more obligations in a criminal case than the defendant. Not only is it subject to the overarching duty of fairness and objectivity recognized in such cases as *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), but it is under the more specific obligation to provide the defendant all exculpatory evidence within its control, *see Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Should the government be able to avoid its *Brady* obligation by destroying exculpatory evidence before

the defendant knows it exists? Is the government's duty of fairness and candor satisfied when it allows one of its agents to testify in a way that the prosecutor knows is incorrect?[1] Can the government free itself of the obligation of fundamental fairness and candor—and empower itself to destroy exculpatory evidence and conceal exculpatory witnesses—by getting a signed waiver from a poorly educated defendant who has no understanding of what he is giving up?

I discuss below my specific points of difference with the majority—the various ways in which I believe the United States and the district court failed in their duty to this defendant.[2] I'm not sure that every one of these errors would, standing alone, merit reversal. But the errors build upon one another to the point where I cannot join my colleagues in concluding that Ramirez–Lopez's trial was fair. I must therefore respectfully dissent.

## I. Delay in the Arraignment

Ramirez–Lopez was taken into custody on March 6, but not presented to a magistrate judge until two days later, on March 8. The majority is right that Ramirez–Lopez had the burden of showing that the delay was unreasonable, because his first court appearance occurred less than 48 hours after his arrest (although just barely). *See County of Riverside v. McLaugh-*

*lin,* 500 U.S. 44, 56, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991).[3] But the majority is wrong to conclude that the delay was not unreasonable just because government agents did not use the time to further interrogate Ramirez–Lopez. Maj. op. at 1151. *Riverside* held that unreasonable delay includes "delays for the purpose of *gathering additional evidence to justify the arrest,* a delay motivated by ill will against the arrested individual, or delay for delay's sake." 500 U.S. at 56, 111 S.Ct. 1661 (emphasis added). While too busy to take defendant to a federal courthouse only half an hour away, the agents were not too busy to interview the remaining aliens arrested with Ramirez–Lopez, pick out the ones they wanted to keep and make arrangements to return the rest to Mexico before defense counsel could talk to them.

Had defendant been arraigned sooner, say on March 6th or the morning of the 7th, he would have had lawyers appointed on that day, and the lawyers could have obtained the government's permission to talk to the witnesses before any of them were deported. Failing that, they could have sought an order that the witnesses not be deported until they had a chance to talk to them. We need not speculate on this point: After they were appointed, defense counsel did indeed move to prevent deportation of the witnesses until they

---

1. I say "incorrect" rather than "false" because I have no reason to believe the agent in question lied. Rather, it appears far more likely he was confused or had a mistaken recollection. Nevertheless, the statement was clearly incorrect, and there's no question that the government lawyer knew it. In such circumstances, I believe the government has a duty to correct the record and not let the misstatement stand. *See, e.g., Napue v. Illinois,* 360 U.S. 264, 269–70, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

2. Defense counsel Mark Windsor and Benjamin Coleman, by contrast, did a marvelous

job, fighting like tigers for their client and preserving a splendid record for appeal.

3. The government estimates that Ramirez–Lopez was detained at 11:00 a.m. on March 6, 2000. That gave the government until 11:00 a.m. on March 8 to bring him before the court for a probable cause hearing. The record suggests that his hearing began on March 8 at approximately 10:07 a.m.—just 53 minutes before the delay would have become presumptively unreasonable. *See Riverside,* 500 U.S. at 56, 111 S.Ct. 1661.

could talk to them, and the district court did grant the order—but it came too late. *See* p. 1167–68 *infra.*

It's hard to tell for sure whether, had counsel been appointed earlier, they could have talked to the witnesses before they were deported.[4] But counsel did bring the motion following a weekend and it's entirely possible that, had they been appointed even twenty-four hours earlier, they could have filed the motion on the preceding Friday. Whether this would have been soon enough is, again, unclear. But defendant has at least raised a plausible theory, one that deserves further factual development. If delay in the appointment of counsel delayed issuance of the district court's order staying deportation of the witnesses (which is quite likely) and if an order issued the preceding Friday, March 10, would have been timely to prevent deportation (which is at least possible), then defendant would certainly have shown prejudice from the delay. Coupled with the other errors discussed below, this may well be sufficient to undermine our confidence in the verdict.

## II. Deportation of the Witnesses

More than three decades ago, in *United States v. Mendez–Rodriguez,* 450 F.2d 1 (9th Cir.1971), we held that the government may not deport alien witnesses who might help the defense. *Id.* at 5. This is hardly a remarkable proposition; it flows ineluctably, not merely from the government's specific duty of fairness toward criminal defendants, but from the more general duty of all litigants not to destroy evidence or put material witnesses beyond the reach of the court.

The Supreme Court also recognized this right in *United States v. Valenzuela–Bernal,* 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982), where it considered whether this duty was violated when a criminal defendant couldn't explain how lost testimony would have helped his defense. The Court, clarifying *Mendez–Rodriguez,* held that a Fifth or Sixth Amendment violation will not be presumed in every case where witnesses were removed by the government, but only where the defendant makes a showing—albeit not a very specific showing—that the removed witnesses could have testified in a way that would have been "both material and favorable to the defense." *Id.* at 873, 102 S.Ct. 3440.

In *United States v. Dring,* 930 F.2d 687 (9th Cir.1991), we interpreted *Valenzuela–Bernal* and held that, in order to obtain a reversal based on the government's removal of potential defense witnesses, a defendant must show that the government acted in bad faith: " '[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.' " *Id.* at 695 (quoting *Arizona v. Youngblood,* 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988)).

What *Mendez–Rodriguez, Valenzuela–Bernal* and *Dring* have in common is that they are all cases where no one knew what the witnesses would have said, had they been available to testify. None were cases where the government got rid of witnesses it knew could provide exculpatory evidence. This is particularly significant in light of footnote 7 of *Dring,* which discuss-

---

4. As best I can tell from the record, defendant was arraigned at 10:07 a.m. on March 8, 2000, and presumably counsel was appointed at that time. This was a Wednesday and counsel brought the motion to stay deportation of the witnesses the following Monday, March 13. The record does not reflect whether counsel made informal efforts to talk to the witnesses before bringing the motion. At the March 13 hearing, the government represented that it did not know whether any of the witnesses were still in the United States and opposed Ramirez–Lopez's attempts to stay their deportation.

es the meaning of "bad faith" under *Youngblood*:

> *Youngblood* and its predecessor access cases involved the loss of *potentially exculpatory evidence.* Thus, the question of bad faith was essential to the Court's inquiry. By way of contrast, in *Brady v. Maryland* and *United States v. Agurs,* the Government failed to disclose *evidence which it knew to be exculpatory.* Thus, the question of bad faith was irrelevant.

**5.** *See, e.g., Valenzuela-Bernal,* 458 U.S. at 866, 102 S.Ct. 3440 ("Congress' immigration policy and the practical considerations discussed above demonstrate that the Government had good reason to deport [defendant's] passengers *once it concluded that they possessed no evidence relevant to the prosecution or the defense of [defendant's] criminal charge.*" (emphasis added)); *id.* at 872, 102 S.Ct. 3440 ("[T]he responsibility of the Executive Branch faithfully to execute the immigration policy adopted by Congress justifies the prompt deportation of illegal-alien witnesses upon the Executive's good-faith determination that they possess *no evidence favorable to the defendant* in a criminal prosecution." (emphasis added)); *Dring,* 930 F.2d at 695 (" '[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve *potentially useful* evidence does not constitute a denial of due process of law.' " (emphasis added)).

**6.** This makes perfect sense, given the purpose of the standard and the rights involved: *Brady* wasn't concerned with the "misdeeds of a prosecutor," but with "avoid[ing] an unfair trial to the accused." *Brady,* 373 U.S. at 87, 83 S.Ct. 1194; *see also Youngblood,* 488 U.S. at 57, 109 S.Ct. 333 ("[T]he good or bad faith of the State [is] irrelevant when the State fails to disclose to the defendant *material exculpatory evidence.*" (emphasis added)). The defendant's trial doesn't become any more fair because the government had good intentions when it destroyed dispositive evidence. Hence, where we know the evidence was exculpatory, there's no reason to focus on anything *but* "the harm to the defendant resulting from nondisclosure," *United States v. Agurs,* 427 U.S. 97, 104 n. 10, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)—that harm, and nothing

930 F.2d at 693 n. 7 (citations omitted) (emphasis in original).

According to *Dring,* then, the *Mendez–Rodriguez* line of cases applies only to innocent removal of aliens by the government.[5] Cases where the government removes aliens it knows can provide exculpatory evidence are analyzed pursuant to the standard developed in *Brady,* and in such cases—let's all say it together—"the question of bad faith [is] irrelevant." *Dring,* 930 F.2d at 693 n. 7.[6]

else, is what triggers the violation. *See id.* at 110, 96 S.Ct. 2392 ("[S]uppression of evidence results in constitutional error ... because of the character of the evidence, not the character of the prosecutor."); *see also California v. Trombetta,* 467 U.S. 479, 489, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984).

The situation is obviously different where material is lost or destroyed before it can be examined. There, no one knows for sure what impact (if any) it might have had on the trial. In such circumstances, it's less reasonable to force police to preserve everything that might have "conceivable evidentiary significance," *Youngblood,* 488 U.S. at 58, 109 S.Ct. 333, or to find a constitutional violation where a defendant can only speculate that he suffered harm. The Court therefore grafted a bad faith requirement onto the *Brady* rule—applicable *only* where the value of the evidence wasn't clear—to "limit[] the extent of the police's obligation ... to reasonable bounds and confine[] it to that class of cases where the interests of justice most clearly require it, *i.e.,* those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." *Id.*

To be perfectly clear, bad faith is not relevant in this case because we *know* the evidence was exculpatory. But even if bad faith were relevant, as both the district court and my colleagues appear to assume, there clearly was bad faith here. As the Court explicitly stated in *Youngblood*: "The presence or absence of bad faith ... must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Id.* at 57 n. *, 109 S.Ct. 333. And there is no doubt that the government knew it was destroying exculpatory evidence

This, of course, is our case. Defendant here not only has shown that the deported witnesses would have helped his case, but did so based on notes taken by the government agents who interviewed the witnesses. While the agents' knowledge could be imputed as a matter of law to the prosecutor under *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and *Kyles v. Whitley,* 514 U.S. 419, 438, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), this is not necessary here, because the agents brought the matter to the personal attention of the Assistant United States Attorney:

> Defense counsel: In deciding which aliens to keep and which to send back to Mexico, did you consult with the United States Attorney's Office?
>
> Agent Nieto: Yes, I did.
>
> Defense counsel: Who did you consult with at the United States Attorney's Office?
>
> Agent Nieto: With John Parmley.
>
> Defense counsel: Did you consult with him before you made your decision?
>
> Agent Nieto: Yes, I did.
>
> Defense counsel: And did you give him your impression as to which aliens you wanted to keep in the United States?
>
> Agent Nieto: Yes, I did.
>
> Defense counsel: And what did you tell him at that time?
>
> Agent Nieto: Well, initially, as a standard practice, we keep two—we interview all the aliens involved, and we keep two, the strongest witnesses that can support our case. I brought these to John Parmley, and he said that he would like us to keep additional

witnesses who didn't actually point him out as a guide.

> Defense counsel: Did you inform him that some of the witnesses said that he was not the guide?
>
> Agent Nieto: Yes, I did.
>
> Defense counsel: And what did he say with respect to holding on to those witnesses?
>
> Agent Nieto: He said we should hang on to at least three more people who could not identify Mr. Ramirez as a guide.

> . . .

> Defense counsel: Okay. Did you tell Mr. Parmley how many of the aliens had stated that he was not the guide, that Mr. Ramirez was not the guide?
>
> Agent Nieto: Yes.
>
> Defense counsel: And how many was that?
>
> Agent Nieto: It was approximately 13.
>
> Defense counsel: Thirteen altogether said he was not the guide?
>
> Agent Nieto: Yes.
>
> Defense counsel: And he told you to hold on to three of those?
>
> Agent Nieto: Yes.

If this testimony can be taken at face value—and the government has said nothing to suggest that Agent Nieto was mistaken—it puts this case squarely within footnote 7 of *Dring.* The AUSA gets a call from an agent in the field who tells him that there is a group of twelve witnesses who are making statements that exculpate the prime suspect, and the agent asks for guidance about what to do with them. Does the AUSA tell the agent: "Those are all potential defense witnesses, heaven forfend that you send them back before defense counsel has had a chance to

when it deported the witnesses. *See* p. 1166– 67 *infra.*

talk to them." Or, does he say: "I'll go to court right away and see if I can get a defense lawyer appointed so he can talk to the witnesses before they are deported." Or maybe: "Wow, those are the kinds of statements that would be very helpful to the defense. Be sure to video or audio tape them so that if we go to trial the jury can consider them." Or, perhaps: "Be sure that your fellow agents take very careful and detailed notes so that there won't be any doubt as to what the witnesses said." Or, just possibly: "If you do have to send the witnesses back, be sure to get contact information for them in Mexico so that defense counsel will be able to find them."

The AUSA says nothing of the sort. What he does say is: "Keep the two that help us, pick three that help the defendant and send the rest back." Send the rest back? Put beyond the reach of the court witnesses the prosecutor knows can help defendant's case? I've never heard of such a thing and I am astonished that the district court approved such conduct, to say nothing of my colleagues on this panel.[7]

The government tries to justify itself by claiming the Mexican Consulate was clamoring for return of the aliens. It also claims it did Ramirez–Lopez a big favor by keeping the three best witnesses for his case. This is all eyewash. There is no doubt the government had the authority to keep any and all aliens it considered material to the enforcement of its criminal laws. In fact, it kept the two aliens who incriminated Ramirez–Lopez, plus three others, yet Mexico did not protest the detention to the U.N. Security Council. In the related

case of *United States v. Matus–Leva*, 311 F.3d 1214 (9th Cir.2002) 2002 U.S.App. LEXIS 24659, also decided by our panel, the government kept all eight of the alien witnesses—who, perhaps not coincidentally, all incriminated the defendant in that case. The government insults our intelligence by suggesting that it could not and did not keep every single alien who might have helped its case in court. It sent back the rest because it did not view protection of defendant's rights as an equal priority.

As for its claim that it kept the three best witnesses for the defense, the short answer is that it is not within the job description of an INS agent to figure out which witnesses will best undermine the government's prosecution of individuals charged with violating the immigration laws. INS agents have a certain lack of objectivity—one might even say conflict of interest—in figuring out which witnesses help the defense. Aside from the fact that they are not lawyers, I have to assume their hearts just weren't in it. Which is why we appoint lawyers, not INS agents, to represent defendants in court.

The government's lame excuses may satisfy the district court and my colleagues who, unfortunately, are faced with the problem of closing the barn door after the mare has fled. But there is one judicial officer who considered the problem in a much different context: This is Magistrate Judge Ruben B. Brooks, who issued an order staying the deportation of the aliens at a time when it wasn't clear whether they had all been deported. The magistrate judge was not satisfied with the government's assurances that it picked the

---

7. One of our cases made a short-lived and unconvincing attempt to distinguish oral testimony from other types of evidence. *See United States v. Velarde–Gavarrete*, 975 F.2d 672, 675 (9th Cir.1992) (rejecting "the distinction between 'actually exculpatory' and 'potentially exculpatory' as these terms are applied to oral testimony"). That case was superseded by *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), which, in the same context, treated oral testimony and documentary evidence exactly the same way. *See id.* at 453–54, 115 S.Ct. 1555.

best witnesses for the defense, nor was he cowed by fears that Mexico might send a regiment of Federales to rescue the aliens. Rather, he did the entirely sensible thing—he ordered the aliens detained long enough for defense counsel to talk to them. It turned out to be too late, but the magistrate judge's order is significant because it establishes beyond doubt that defendant was prejudiced by the government's haste in returning the witnesses to Mexico. Had the government kept them here just a few days longer—long enough for a defense lawyer to be appointed and submit the matter to adjudication—we know the court would have granted him the right to speak to those witnesses. And, after any such debriefing by the defense lawyers, the government would have had no excuse for choosing whom to retain here; the decision would have been made by defense counsel and, if the government contested it, by the district court. That, of course, is the lawful and orderly way to proceed.

### III. The *Lujan–Castro* Waiver

*United States v. Lujan–Castro*, 602 F.2d 877 (9th Cir.1979), which holds that a criminal suspect may waive his right to have the government retain deportable aliens who may be witnesses on his behalf, is cut from the same cloth as *Mendez–Rodriguez*, *Valenzuela–Bernal* and *Dring*. Like these other cases, *Lujan–Castro* dealt with a situation where the defendant had made no showing that the deported witnesses could present any exculpatory evidence; there was certainly no indication that the

witnesses were deported after the government had learned that they could provide evidence helpful to the defense. *See* 602 F.2d at 878.

Limited to its facts, *Lujan–Castro* is a bit troublesome, but entirely understandable.[8] The government often makes arrests where there are numerous individuals who could theoretically serve as witnesses. Where the crime is domestic, there is no need to keep those persons in custody; it is enough for the government to obtain contact information so both the prosecution and the defense can track them down to see whether they have anything useful to say. The situation is much more difficult where the witnesses are aliens who entered the United States illegally; there are numerous cases where scores of such aliens are involved. *See, e.g., United States v. Ramirez–Jiminez*, 967 F.2d 1321 (9th Cir.1992) (fifty-one aliens); *United States v. Trinidad*, 660 F.2d 387 (9th Cir. 1981) (twenty-three aliens). These witnesses can't be released into the United States, because they are here illegally; but it is quite expensive and oppressive to keep them all in custody until trial on the theoretical possibility that the defense may choose to call them as witnesses. *See Valenzuela–Bernal*, 458 U.S. at 865, 102 S.Ct. 3440.

*Lujan–Castro* is best viewed as a common-sense accommodation between theoretical perfection and the realities of keeping large numbers of aliens in custody for long periods of time for no useful purpose. Where the government has no reason to

---

**8.** It is troublesome because it presupposes that a lay defendant—one with absolutely no legal training and little familiarity with our legal system—can ever make a knowing and intelligent decision about whether witnesses can provide evidence helpful to the defense. It seems to me that one would have to know and understand, at the very least, the elements of the crime and any possible defenses before one could make anything like an in-

formed judgment about whether to waive the important right to prevent the government from putting witnesses beyond the reach of the court and defense counsel. Nevertheless, that's what *Lujan–Castro* holds and I accept it, so long as it's confined to the situation where the government does not know that the witnesses would have provided exculpatory evidence.

believe the witnesses can offer anything helpful to the defense, it makes considerable sense to obtain defendant's waiver early so that the individuals can be taken back across the border.

The situation is much different where, as here, the government knows that the witnesses have information that would be helpful to the defense. I do not read *Lujan–Castro* as a license for the government to destroy evidence, undermine *Brady* and dispose of witnesses that help the defense and hurt the prosecution.

A careful reading of *Lujan–Castro* and its rationale leaves room for no other conclusion. *Lujan–Castro*, by its terms, held that a defendant may waive the rights guaranteed to him by *Mendez–Rodriguez.* See 602 F.2d at 878–79. That case, in turn, held that a defendant was entitled to have the government retain deportable witnesses, whether or not the defendant can make a showing that the witnesses have information useful to the defense. *See* 450 F.2d at 5. *Lujan–Castro* did not address—and could not address, because the issue was not raised by its facts—what is required for a defendant to waive the more specific right to have the government preserve and make available evidence it knows is helpful to the defense, i.e., the rights guaranteed by the "access to evidence" cases. *Valenzuela–Bernal,* 458 U.S. at 867, 102 S.Ct. 3440.

A case such as this—the very case now before us—presents very different considerations than the generalized and non-specific right guaranteed by *Mendez–Rodriguez.* Consider, for example, a case where the government finds underwear stained with semen at the scene of a sex crime, tests it and finds it *not* to match the defendant—and then proceeds to destroy the sample and the test report. When this is discovered by the defense, the government presents a waiver—signed by the defendant before counsel was appointed— where he agrees that the government may clean up the scene of the crime and get rid of any clothing and other materials it does not consider useful. I can't imagine that our court—or any court—would consider that general waiver sufficient to cover knowing destruction of exculpatory evidence. *Cf. Youngblood,* 488 U.S. at 57–58, 109 S.Ct. 333. At the very least, that case raises very different issues as to what constitutes a knowing and intelligent waiver than the case where the police have performed a general cleanup of the crime scene with no reason to believe that the materials being destroyed have any relevance to the defense.[9]

Because I do not find *Lujan–Castro* relevant to our case, it makes no difference whether or not the waiver was obtained knowingly and voluntarily.[10] The waiver

**9.** Because the *Lujan–Castro* waiver does not excuse, or in any way diminish, the government's responsibility to disclose evidence it knows is exculpatory, *see Brady,* 373 U.S. at 87, 83 S.Ct. 1194, or to preserve such evidence in a form in which it can be used, *see Trombetta,* 467 U.S. at 489, 104 S.Ct. 2528, suspects presented with a *Lujan–Castro* waiver can reasonably assume that the government wouldn't knowingly deport witnesses that made exculpatory statements. Waivers like the one here are therefore hardly "knowing": Implicit in the waiver request is a representation that the government doesn't know the witnesses had exculpatory information.

*See Valenzuela–Bernal,* 458 U.S. at 872, 102 S.Ct. 3440. Had defendant been properly informed, he may not have signed the waiver. I can imagine few defendants who would sign a waiver allowing the government to destroy evidence they know could be helpful to them.

**10.** Even though I don't think it affects the outcome, it is far from obvious that the waiver here was valid. Ramirez–Lopez doesn't contest that the agent read the waiver to him, and he admits that he signed it. But there is no evidence that anyone explained to him what the waiver meant or made sure that he understood the nature and scope of the right

simply didn't cover what the government did here. Defendant was entitled, under the *Brady/Trombetta* line of cases, to have the government preserve, for review by his counsel, witnesses the government knew could exonerate him. He did not waive this right.[11]

## IV. The Interview Notes

In light of the above, I have no difficulty concluding that the district court abused its discretion in refusing to admit the interview notes and other evidence of the number of witnesses who failed to identify Ramirez–Lopez as the culprit. The reason we have a hearsay problem in the first place is that the government removed witnesses from the court's jurisdiction so they could not testify. It strikes me as a big gotcha to then deny admission of the witness statements because the witnesses are unavailable. Because the government breached its duty of keeping the witnesses in the United States long enough for defense counsel to interview them, the least we can do to make up for the harm is to let the jurors know what those witnesses would have said if they had testified. *Cf.* Fed.R.Evid. 804(b)(6).

But even if deportation of the aliens had been lawful, I have considerable difficulty with the district court's decision to exclude the interview notes and all other evidence about how many of the aliens in defendant's group identified defendant as the guide. Remember the factual scenario: Defendant and fourteen others were arrested as a group while attempting to cross the border on foot; they had been caught in an unexpected snowstorm and some (including defendant) suffered frostbite; one member of the party died. Defendant wore no uniform, epaulettes or miter marking him as the leader; he had no name-tag with the inscription: "Hello, my name is Juan. I'm your guide!" The

he was waiving. In fact, when asked at the motions hearing if he understood the waiver, Ramirez–Lopez answered that the agent had told him that if he signed the waiver, the other aliens could return home to Mexico ("[The agent] gave me this reason for me to sign that paper so that the witnesses could go to Mexico. I didn't know anything else."). This hardly shows that Ramirez–Lopez understood that he had a right to retain those aliens *as witnesses*. If he didn't make the connection that letting the aliens return home meant *not* having the aliens to testify on his behalf, then the waiver may not have been knowing or intelligent: Rather than merely misunderstanding the consequences of a waiver, he would have failed to understand the right itself.

The problem is exacerbated by the lack of a finding by the district court. My colleagues rely on the district court's finding that Ramirez–Lopez's *Miranda* waiver was valid. But that waiver was recorded (the *Lujan–Castro* one wasn't), so we have a better idea of how that right was explained. The *Miranda* waiver also involves a right that's easier to understand and certainly more widely known; that Ramirez–Lopez may have understood the right to remain silent does not mean he also understood his right to retain witnesses for his defense. It is thus not good enough for the majority to point to the *Miranda* finding and shrug off the district court's failure to make a specific *Lujan–Castro* finding as harmless error. It was far from harmless if defendant only signed the waiver because he thought doing so would let the detained witnesses go home, without understanding the effect that would have on his ability to present a defense.

11. Even if the government were right that the waiver extends to exculpatory witnesses, I'm not at all sure that the government could ask defendant to sign such a waiver without disclosing whatever exculpatory material it knew at the time. The government could easily undermine *Brady*'s rule against suppressing evidence if it could document exculpatory evidence in a form that isn't admissible, destroy the evidence and only then turn over the remaining inadmissible material to the defendant. *Brady* operates not only to let the defendant know what evidence exists, but also to give him a chance to *use* that evidence in court.

INS agents nonetheless developed the suspicion that he was the guide and then went about doing what law enforcement agents are trained to do: find evidence supporting their theory of the case. They came up with some, but nothing to write home about: The owner of a lodge thought she saw Ramirez–Lopez at the front of the group as they walked. One agent said Ramirez–Lopez attempted to speak for the group after they were caught; a different agent that Ramirez–Lopez seemed to coach the others on what to say and was the most talkative, yet tried to hide in the crowd when the group was asked if they had a guide. Government witnesses also claimed that he was "better dressed" for the trip. None of these observations conclusively establishes that defendant was the guide, and many were explained, contested or refuted by defendant's case or on cross-examination.[12] Their big find—the mortar that binds all these bits and pieces of evidence together—is the testimony of the two alien witnesses who (at least initially) identified defendant as the guide.[13] The problem was, the overwhelming number of people in that same group denied that defendant was the guide.[14]

Given the government's largely circumstantial and not terribly convincing case, can we say with assurance that the jury would not have been swayed, had it been told that thirteen of the fourteen witnesses who were traveling with defendant—including every single one of the nine that were deported—denied that defendant was the guide? To me, the answer plainly is no. It is simple common sense that witnesses reinforce or undermine each other, and juries often determine the facts, not on the basis of what any particular witness says, but on how well the testimony of the

---

12. For example: The lodge owner observed the group for only a short time, while Ramirez–Lopez was in the lead; but others testified that, after the guide had abandoned them, various members of the group took turns being at the front of the group. As for Ramirez–Lopez's clothes, he did have a jacket, but so did at least one other alien, and many in the group were dressed for the weather; and tellingly, Ramirez–Lopez wore tennis shoes—not a likely choice by a professional guide for a trek through the snow—while many aliens wore boots. Nor could the government find a single witness to testify that defendant coached him or others when they were interviewed in the field.

13. I say "initially" because one of these witnesses testified at trial that his original statement had been misunderstood, and that defendant was not the guide. He had been asked, he explained, who was in the lead, not who was the group's guide, and he had identified Ramirez–Lopez because he'd spent time at the head of the group. In response to persistent questioning by the prosecutor, this witness testified unequivocally that, to his knowledge, Ramirez–Lopez was not the guide.

14. Just to be perfectly clear about the evidence the court excluded:

Francisco Servin–Hernandez: Said that the group's guide was gone halfway through the trip

Andres Corona Martinez: Identified Ramirez–Lopez as a member of the group, but not its guide

Andres Corona–Martinez (different alien): Claimed that he simply crossed with six of his friends and that there was no guide

Luis Delgado–Ballejo: Couldn't recognize the guide of the group from a photo lineup that included defendant's picture

Juan Diego Servin Hernandez: Identified defendant as part of the group but stated that he was not the guide

Luis Alberto Gonzales–Jimenez: Recognized defendant, but didn't say he was the guide

Jose Luis Lopez Carmena: Suggested that the guide left during the trip, claiming that he would come back but never returned

Miguel Garcia–Almanza: Identified Ramirez–Lopez as a member of the group who helped the alien who died during the trip, but not as the guide

Arturo Alcaraz–Ambriz: Said he never saw anyone give directions to the group

various witnesses harmonizes with that of others and with the circumstantial evidence.

Here, one witness testified unequivocally that defendant was the guide; another had said something that might have been understood as identifying defendant as the guide, but at trial explained, rather convincingly, that this isn't what he had meant; three other witnesses—two in their teens—testified defendant wasn't the guide. How would the jury go about resolving this conflict among the eyewitnesses? If the jury were led to believe—as they surely were—that this division of views was representative of the group as a whole, they could well conclude that defendant had managed to coach, or possibly intimidate, some of the witnesses. This conclusion is much harder to reach if the jury learns that everyone in the group—with the single exception of the witness who testified for the government—had stated in separate and independent interviews with government agents that defendant was not the guide. Coaching thirteen witnesses is obviously much harder than coaching three or four, and the very fact that the accusing witness stood alone at trial could well have cast doubt on his credibility.

Which is doubtless why the government worked so very hard to create the illusion that the witnesses presented at trial were representative of the group as a whole, and that the witness who pointed the finger at defendant was but one of several in the group to do so. Indeed, one of the INS agents testified precisely to this effect:

> Defense counsel: What is your understanding of what the word "several" means?
>
> Agent Senior: Several would be more than one or two.
>
> Defense counsel: More than one or two?
>
> Agent Senior: That is correct.

> Defense counsel: How many people were in this group altogether?
>
> Agent Senior: I believe, apprehended, there were somewhere around 14.
>
> Defense counsel: Altogether?
>
> Agent Senior: That's correct.
>
> . . .
>
> Defense counsel: Only two of them ever identified Mr. Ramirez as the guide in this group of 14; is that correct?
>
> Agent Senior: No. I believe more than two identified him as the guide.
>
> Defense counsel: You believe one of them?
>
> Agent Senior: I believe more than two.
>
> Defense counsel: One or two?
>
> Agent Senior: No. More than two.
>
> Defense counsel: More than two?
>
> Agent Senior: That's correct.
>
> Defense counsel: What are their names?
>
> Agent Senior: I couldn't tell you their names.
>
> Defense counsel: You believe more than two did?
>
> Agent Senior: Yes.
>
> . . .
>
> Defense counsel: What makes you think that more than one or two identified him?
>
> Agent Senior: From talking to the other agents at the time.
>
> Defense counsel: From talking to the other agents?
>
> Agent Senior: That is correct.
>
> . . .
>
> Defense counsel: [D]id you tell [Ramirez–Lopez] that 12 of the 14 people being held said he was not the guide of that group? Did you tell him that?

Agent Senior: I am sorry. Could you repeat the question?

Defense counsel: Did you tell him—Did you inform him that the people that would be released, 12 of those people would say and had said to agents that he was not the guide of that group? Did you inform him of that?

Agent Senior: That would have been incorrect.

Defense counsel: It would have been incorrect based on what?

Agent Senior: In my understanding, there was more people in the group that could identify him as a guide.

This testimony was elicited by defense counsel on cross-examination, so this is not a case where government counsel presented what he knew to be false testimony to the court.[15] Indeed, I'm perfectly willing to believe that the agent himself thought he was telling the truth. The fact remains, however, that the testimony was untrue—there was one witness, and only one witness, who unequivocally identified defendant as the guide. The judge, the prosecutor, defense counsel all knew this; everyone, indeed, except the jury. The government was certainly aware that isolating the incriminating witness would be harmful to its case, which is why it fought tooth and nail to keep the information out. Indeed, the government admitted the highly probative nature of the testimony when it argued that it wouldn't "get a fair trial" if this evidence were introduced. Surely, leaving the jury with the *false* impression that the pool of witnesses was more or less evenly split among those who thought defendant was the guide and those who

thought he wasn't was just as prejudicial to *his* case.

The majority upholds the exclusion of the notes on two grounds, neither of which is terribly convincing. The first of these is that the evidence is "cumulative." The term cumulative, however, suggests a needless redundancy, especially where the additional evidence will result in "undue delay" or "waste of time." Fed.R.Evid. 403. Redundancy, however, means that the additional information provides no additional relevant data points to the jury, that they are forced to listen to evidence that tells them nothing at all new. This is surely not the case here. The jury was left with the definite impression that the witnesses at trial were representative of the whole group, not cherry-picked to make the government's best possible case. Letting the jury know what the remaining witnesses had said would have brought to light one additional fact of which the jury simply was not aware: The one witness who testified against defendant was also the *only* witness who would or could have done so; he stood alone in the group of fourteen. I have to believe that a jury would have more difficulty accepting the witness's testimony under those circumstances than if it was misled into believing that he was one of several who could have testified to that effect. Nor can one say that presenting this evidence would have been unduly burdensome or time-consuming. The INS agents' interview notes could have been read into the record in half an hour—far less time than was spent haggling over whether the evidence should be admitted.

---

**15.** Though the government certainly didn't mind leaning on this misperception to support its theory of the case. During closing arguments, for example, the AUSA argued:

> [Defendant] would interrupt other people, ... he would coach them in terms of what to say. Now, you heard some people come in here. They didn't say he did that to them, *but it was a group of 15 people.*

Even less persuasive is the majority's bootstrap argument that the evidence was properly excluded as inadmissible hearsay notwithstanding Fed.R.Evid. 807.[16] The majority apparently concedes that all but one of FRE 807's requirements are met, the one exception being whether the statements carry "circumstantial guarantees of trustworthiness" equivalent to those of hearsay statements admissible under FRE 803 or 804. The majority points to a case where we held such guarantees existed where the evidence was on tape and offered under oath, and notes that the statements here were not made under oath and that "Ramirez–Lopez has not directed the court to any other evidence that establishes that the statements possess guarantees of trustworthiness." Maj. op. at 1153 (citing *United States v. Fowlie*, 24 F.3d 1059 (9th Cir.1994)).

Of course, FRE 807 does not require that the statements in question have been made under oath. Most of the hearsay statements admissible under FRE 803 or 804 are not made under oath, and if that were a requirement for all hearsay, then most hearsay admitted in the federal courts would be excluded altogether. We must examine the list of hearsay exceptions and consider what kinds of guarantees of trustworthiness are generally deemed sufficient. Let's look at a few examples:

*Present sense impression, FRE 803(1).* The statement obviously need not have been made under oath; the guarantee of trustworthiness comes from the fact that when the statement is uttered contemporaneously with the sensation, it is less likely that it is fabricated. The same is presumably true of *Excited Utterance, FRE 803(2)*.

*Then existing mental, emotional, or physical condition, FRE 803(3).* Presumably the guarantee of trustworthiness here is that people wouldn't lie about how they feel.

*Statement of personal or family history, FRE 804(4).* Presumably people seldom lie about things like birth, adoption, legitimacy, relationship by blood or the like. And they are seldom mistaken about them either.

As even a cursory examination of these hearsay exceptions makes clear, the guarantees of trustworthiness that attach to many of the hearsay exceptions are nothing like foolproof. People no doubt lie all the time about their mental, emotional or physical condition, family history, or even their present sense impressions. Yet, statements of this kind fall under well-established exceptions to the hearsay rule. The guarantees of trustworthiness need be nowhere near as certain as giving evidence under oath—indeed, only one of the hearsay exceptions, FRE 804(b)(1), requires that the statement be made under oath. Most exceptions rely on much less reliable guarantees of trustworthiness.

Our task, then, when conducting an 807 analysis, is to go down the list of hearsay

---

**16.** This is a bootstrap argument because the district court didn't exclude the evidence on this basis. Rather, the district court simply found that the evidence would repeat the story that other witnesses were already prepared to tell. ("That's just cumulative. More isn't necessarily better.") FRE 807, of course, has a good bit of discretion built into it and, if the district judge exercises that discretion, we are required to defer to it to a substantial degree. But if the district judge makes no ruling un-

der FRE 807—as the judge here clearly did not—we have nothing to which to defer. For all we know, had the district court understood that he was wrong in his "cumulative" ruling, he may have admitted the evidence under FRE 807. In affirming the district judge's ruling on a ground different from that which he actually employed, the majority is performing the function of the trial court and the appellate court all at once.

exceptions, find one or more that are somewhat analogous to the statements here, and determine whether the guarantees of trustworthiness are approximately the same. Taking the Federal Rules of Evidence off the shelf and running our index finger down the list, we soon come across an exception that is highly analogous indeed. It's so good that I think it's worth quoting in full:

> Recorded Recollection. A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness' memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

Fed.R.Evid. 803(5). Let's parse this Rule carefully. By its terms, it admits statements that record a witness's recollection of matters about which the witness once had knowledge, and that were given at a time when the information was fresh in the witness's memory. All of these requirements fit perfectly the statements of the witnesses here: They were interviewed shortly after the event and did not claim a failure of recollection.

This exception differs from our situation in two respects. First, there is no indication here that the witnesses in question have lost their memory; rather, it is the witnesses themselves who have been misplaced. This, however, doesn't seem to bear on the reliability of the statements; whether the witness now remembers what he said makes it no more likely that he

was telling the truth when his memory was fresh.

The second difference lies in the phrase "shown to have been made or adopted by the witness ... and to reflect that knowledge correctly." The basis for this requirement is that it's more likely the substance of the statement is true—something the witness no longer remembers—if the witness *does* remember thinking that the statement was accurate when he made or adopted it. Here, the witnesses' statements were captured in the notes of INS agents, not the notes of the witnesses themselves. And there's no indication that the witnesses reviewed these notes or expressly adopted them as true. Yet we still have pretty good reason to believe that the statements accurately reflect what the aliens believed at the time, and that the agents' notes capture these statements as given. The interviews were conducted and memorialized by individuals trained to be complete and accurate; moreover, they undermined the government's case against the prime suspect, so there's no reason to think the agents, motivated by bias, reported them inaccurately. The witnesses had no obvious reason to lie, and would have understood that lying to law enforcement authorities could well be dangerous.[17] The statements were roughly consistent with each other, and mutually reinforcing. Indeed, if any of the declarants *was* the actual guide, he would have been the only one with a motive to lie by pointing the finger at someone else in the group—which might well explain why one, and only one, of defendant's fellow travelers identified him as the guide.

Is this as good as having the statements made under oath? Not really. But when compared to some of the other hearsay

---

**17.** The propensity of separately interrogated suspects to tell the truth and snitch each other out is so well-known, it has given rise to one of the best-known principles of economics— the prisoner's dilemma. *See, e.g.,* Robert Axelrod, *The Evolution of Cooperation* (1984).

exceptions discussed above—matters about which people lie all the time—this is not bad at all. I have a hard time concluding that the guarantees of trustworthiness that attach to these statements are significantly weaker than those applicable to the run-of-the-mill hearsay exception under FRE 803 or 804. They seem to fit neatly within the catch-all hearsay exception.

What makes the majority's evidentiary ruling even harder to accept is what rests in the balance. Ramirez–Lopez has a clear Sixth Amendment right to present evidence on his behalf:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies.... This right is a fundamental element of due process of law.

*Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); *see also Chambers v. Mississippi,* 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) ("The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process."). Although this right doesn't directly alter the balance in determining whether out-of-court statements are reliable—either they're trustworthy or they're not—it should affect a court's discretion whether to admit evidence when that balance is close and the evidence is "critical to [the] defense." *Chambers,* 410 U.S. at 302, 93 S.Ct. 1038 ("where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice"). Here it undoubtedly

was, and the majority errs by excluding this crucial evidence.